**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 31, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

WALID MOHAMMED HAIMOUR,

Petitioner,

v.

ALBERTO R. GONZALES, Attorney
General,

Respondent.

No.  05-9520
(No. A-78-889-230)
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY**, **McKAY**, and **MURPHY**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination of

this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is

therefore ordered submitted without oral argument.

Petitioner Walid Mohammed Haimour, a native and citizen of Jordan and a

non-practicing Muslim, seeks a petition for review of a final order denying his

---

[*]    This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

application for asylum, *see* 8 U.S.C. § 1158(a), or for restriction on removal, *see id.* § 1231(b)(3)(A), and ordering his removal.  Because we have no jurisdiction to review the Board of Immigration Appeals' (BIA) decision denying Mr. Haimour's request for asylum as untimely filed, we dismiss that portion of the petition for review.  We have jurisdiction under 8 U.S.C. § 1252(a) to review the decision denying the application for restriction on removal.  *See Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1188 (10th Cir. 2005).  As explained below, because we conclude that the BIA did not err in holding that there is no statutory basis for Mr. Haimour's request for such relief, we deny the petition for review.

## I.

The facts in this case are undisputed.  Mr. Haimour entered the United States in November 1999 and overstayed his six-month non-immigrant visitor's visa.  He was served with a notice to appear in August 2002; removal proceedings commenced in early September 2002.  Later that same month, he allegedly married a United States citizen, who apparently filed a petition for adjustment of status on Mr. Haimour's behalf in November 2002.  *See* R. at 282.  The putative wife died, however, before supplying evidence to support Mr. Haimour's claim of a valid marriage and before the petition was adjudicated.  The petition for adjustment of status was withdrawn on March 26, 2003.  *Id.* at 281.  Mr. Haimour

-2-

subsequently filed an application for asylum and for restriction on removal on June 3, 2003.

The basis for Mr. Haimour's application is that he cannot return to Jordan because, while married to his first wife and living in Jordan, he committed adultery with another Muslim woman in 1996-97, and he now fears for his life. Mr. Haimour asserts that his paramour is a member of the Abu Al-Fadel family, and was betrothed to her cousin. Mr. Haimour testified that his paramour's fiancé attacked him in 1997 after discovering the affair, and that attempts to peacefully settle the matter with the Abu Al-Fadel family had been fruitless. He claimed that the family has vowed to kill him, and that he will not be protected by the Jordanian government because Jordan recognizes "honor killings" as a defense to the murder of women who have engaged in an adulterous relationship.

After a hearing, the immigration judge (IJ) concluded that Mr. Haimour was not eligible to apply for asylum because he did not file his application within one year of entering the United States. *See* 8 U.S.C. § 1158(a)(2)(B); 8 C.F.R. § 208.4(a)(2)(ii) (providing that the one-year filing period commences either on "the date of the alien's last arrival in the United States or on April 1, 1997, whichever is later"). The IJ denied the application for restriction on removal, concluding that Mr. Haimour's claim was based on a personal problem rather than on a statutory ground for restriction on removal.

The Bureau of Immigration Appeals affirmed, expressly adopting the IJ's decision with additional discussion and analysis.

## II.

Under the asylum statute, we lack jurisdiction to review the BIA's determinations that Mr. Haimour's asylum application was untimely and that changed circumstances do not excuse his untimely filing. *See* 8 U.S.C. § 1158(a)(3) (providing that, "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph [§ 1158(a)(2)]," which contains the exceptions to granting asylum); *Tsevegmid v. Ashcroft*, 336 F.3d 1231, 1234-35 (10th Cir. 2003) (dismissing in part because § 1158(a)(3) expressly bars review regarding "whether the alien filed his application within a year of entry or whether changed circumstances exist 'which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application'").

Because Mr. Haimour raises no constitutional claims, our lack of jurisdiction is not affected by the recent passage of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 310, in which Congress amended § 1252(a)(2) to permit judicial review of constitutional claims and questions of law. *See* 8 U.S.C. § 1252(a)(2)(D).[1] *Cf. Perales-Cumpean v. Gonzales*, 429 F.3d 977,

---

[1] "The new subparagraph was made applicable 'to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of enactment' of the Act. Real ID Act § 106(b)." *Perales-Cumpean v. Gonzales*, 429 F.3d 977, 982 n.4 (10th Cir. 2005).

(continued...)

982-83 & n.4 (10th Cir. 2005) (holding that "the Real ID Act does not provide this court with jurisdiction to review the agency's [discretionary] determinations on the 'extreme cruelty' and credibility issues" raised in a cancellation of removal petition brought under 8 U.S.C. § 1229b(b)(2) because Congress specifically stripped courts of jurisdiction to review such discretionary decisions). We therefore dismiss for lack of jurisdiction the challenge to the denial of Mr. Haimour's application for asylum.

## III.

Because his removal proceedings commenced after April 1, 1997, Mr. Haimour's petition for review challenging the denial of restriction on removal is governed by the permanent rules of the Illegal Immigration Reform and Immigrant Responsibility Act. *See Tsevegmid,* 336 F.3d at 1234 n.3. To obtain restriction on removal to Jordan, Mr. Haimour had to demonstrate that his "life or freedom would be threatened in [Jordan] *because of* [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A) (emphasis added); *see also* 8 C.F.R. § 1208.16(b). He had to show that "it is more likely than not that [he] would be subject to persecution on one of the specified grounds" upon returning to Jordan. *INS v.*

---

[1](...continued)

*Stevic,* 467 U.S. 407, 429-30 (1984); *Tulengkey v. Gonzales,* 425 F.3d 1277, 1280 (10th Cir. 2005). If Mr. Haimour established a "clear probability of persecution" because of one of the enumerated grounds upon return to Jordan, the Attorney General would be prohibited from removing him to that country. *See Stevic,* 467 U.S. at 413, 422 n.15.

Mr. Haimour based his eligibility for restriction on removal on his assertion that he belongs to a persecuted "particular social group," which he defined as "'a person who has had sexual relations outside marriage and thereby brought dishonor upon the Abu Al-Fadel tribe or family.'" R. at 56. The IJ and BIA disagreed that Mr. Haimour belongs to a protected social group, concluding that he simply has a personal conflict with specific individuals that does not qualify for relief under § 1231(b)(3)(A). *Id.* at 3, 56.

"What constitutes a particular social group is a pure question of law that we review de novo." *Cruz-Funez*, 406 F.3d at 1191.

> The INA does not define the phrase "particular social group." The term comes directly from the United Nations Protocol Relating to the Status of Refugees . . . [but][w]hen Congress ratified the Protocol on October 4, 1968, it did not shed any further light on the definition. The [BIA] has decided that a "particular social group" is "a group of persons all of whom share a common, immutable characteristic . . . that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *In re Acosta,* 19 I. & N. Dec. 211, 233-34 (BIA 1985). The agency's reasonable interpretation of a statute it administers is entitled to deference. But the Board left it to be

decided on a case-by-case basis what "particular kind of group characteristic . . . will qualify under this construction." *Acosta,* 19 I. & N. Dec. at 233.

The courts are struggling to set the parameters for the definition of a "particular social group" in light of *Acosta.* The circuit courts are not in agreement on a test.

*Id.* (citations omitted). In *In re Acosta*, the BIA held that a taxi cooperative did not constitute a "particular social group." Since the drivers could change jobs, the characteristic of being a taxi driver was not immutable. *In re Acosta*, 19 I. & N. Dec. 211, 234 (BIA 1985), *overruled on other grounds by, In re Mogharrabi*, 19 I.&N. Dec. 439 (BIA 1987). Although we did not adopt a definition of "particular social group" in *Cruz-Funez*, we held that the petitioners there could not prevail under the BIA's definition adopted in *In re Acosta* or under any of the circuit courts' tests because "[b]eing indebted to the same creditor (unscrupulous or not) is not the kind of group characteristic that a person either cannot change or should not be required to change." *Cruz-Funez*, 403 F.3d at 1191-92.

A few months after our decision in *Cruz-Funez*, we adopted the BIA's definition of a "particular social group." *See Niang v. Gonzales*, 422 F.3d 1187, 1198-99 (10th Cir. 2005). We held that, because the term "social group" was ambiguous and the BIA's interpretation in *In re Acosta* was a permissible construction of the term, we were compelled to defer to that construction. *Id.* at

1199. Accordingly, applying the BIA's definition, we held in *Niang* that sexually mutilated "female members of a tribe would be a social group [because] [b]oth gender and tribal membership are immutable characteristics." *Id.*

Applying the BIA's definition to the facts in this case, we conclude that Mr. Haimour does not belong to a protected social group under the immigration statutes. First, being an adulterer, like being a debtor, *see Cruz-Funez*, 406 F.3d at 1192; a drug dealer, *see Bastanipour v. INS*, 980 F.2d 1129, 1132 (7th Cir. 1992); a tatooed youth, *Castellano-Chacon v. INS*, 341 F.3d 533, 549 (6th Cir. 2003); or a taxi driver, *In re Acosta,* 19 I. & N. Dec. at 234, is not a protected characteristic. Committing adultery is not "fundamental to [a group's] individual identities or consciences" and the immigration laws do not recognize a protected right to commit adultery just as they do not recognize a protected right to maintain a particular job. *See In re Acosta*, 19 I. & N. Dec. at 233.

Second, Mr. Haimour has not established that he is a member of any "group." As Mr. Haimour admits, adulterous men are not necessarily subject to death under Islamic law. In fact, Mr. Haimour testified that he had hoped that his paramour's family would agree to him taking her as his second wife or allowing him to pay money for having impugned the family's honor. Assuming his testimony is credible, the Abu Al-Fadel family seeks only to punish him and not

-9-

the universe of men who commit adultery with a Muslim in Jordan. His alleged social "group" is thus limited to himself.

And third, Mr. Haimour has failed to establish a nexus between the alleged persecution and one of the five statutory grounds, which is a critical issue in immigration law. For example, in *INS v. Elias-Zacarias*, 502 U.S. 478 (1992), the Supreme Court held that, for an applicant to qualify for asylum protection, persecution must be on account of the *victim's* political opinion or other protected characteristic,[2] not that of the persecutor. *See id.* at 482 ("if a fundamentalist Moslem regime persecutes democrats, it is not engaging in persecution on account of religion"). Here, Mr. Haimour, who states he is a nonpracticing Muslim, does not fear persecution because he is or is not a Muslim; he fears it because the Abu al-Fadel family wants to punish him for disgracing it. Further, Mr. Haimour presented no evidence that Jordanian law protects those who injure or murder men

---

[2] An asylum applicant has the burden of proving his eligibility for asylum by first establishing that he is a "refugee" as defined in 8 U.S.C. § 1101(a)(42). *Yuk v. Ashcroft,* 355 F.3d 1222, 1232 (10th Cir. 2004). "The term 'refugee' means (A) any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." § 1101(a)(42). Thus, the grounds for restriction on removal are the same five protected grounds given in the definition for "refugee." *See* 8 U.S.C. § 1231(b)(3)(A).

-10-

who commit adultery. The BIA did not err in concluding that Mr. Haimour is not eligible for restriction on removal.

The petition for review is DISMISSED in part for lack of subject matter jurisdiction, and DENIED in part.

Entered for the Court


Michael R. Murphy
Circuit Judge